NEW YORK COUNTY.— HON. D. G. ROLLINS, SURRO-
GATE.—July, 1883.

SEITER V. STRAUB.

*In the matter of the application for the probate of a paper propounded as the last will and testament of* FANNY BOSCH, *deceased.*

The degree of control which is sufficient to invalidate a will depends largely upon the age of the will-maker, influences which might legitimately be exercised upon a person of mature years justly falling under the condemnation of the law when brought to bear upon an infant of sixteen.

Even the earnest persuasions, of the interested and self-seeking, will not necessarily vitiate a testamentary instrument by which they are largely benefited, if it appears that the testator, in selecting them as the recipients of his bounty, has acted on his own judgment, and not merely

given expression to the purposes of others, by whose will his own has been subdued.

*It seems*, that the question whether a guardian has power to compel his ward to *dwell* in a place of his selection is by no means identical with the question whether he has power to change the *legal domicil* of the latter; and that the bare fact of a grant of letters of guardianship to one whose domicil differs from that of the ward does not effect such a change.

As to whether any guardian, other than one by nature, has power to change the domicil of the ward, *quære*.

Decedent, a female orphan, who died at St. Francis' Hospital, in Jersey city, in September, 1880, executed the paper propounded as her will, at the house of her aunt, the proponent, in that city, about November 1st, 1879, being barely of the age of sixteen years. The instrument gave all to proponent and nominated her as sole executrix. The attestation clause was subscribed by a female servant of proponent, since deceased, and by one H., whom, it appeared, proponent had declared to be deficient in intelligence, and whose testimony as to the execution contained serious discrepancies. It appeared, that decedent was weak in body, of a gentle and compliant disposition, and with little strength of character, and that, by reason of her illness and docility, her volition could easily have been dominated by one having the motive and opportunity to control it; in the summer of 1877, decedent, while living in New York, the domicil of her late parents, becoming seriously ill, was taken by her aunt to the hospital mentioned, where she remained, save for brief absences, till her death; during this interval, proponent's husband, domiciled in New Jersey, was appointed decedent's general guardian by the Surrogate of New York, but was removed from office by the Supreme Court, shortly before October, 1879; decedent was brought to her aunt's house, for the purpose of executing the paper, and immediately afterwards taken back to the hospital; proponent's testimony, with respect to the circumstances attending the execution, was confused, self-contradictory, and in some instances palpably false; two of her children, aged twenty-one and seventeen, respectively, who had been present on the occasion, were not called as witnesses; the instrument was drawn by a lawyer, who, for a reason unexplained, retired from the premises just before the execution, and returned soon afterwards. The probate was contested, on the grounds of want of due execution, want of testamentary age under the laws of New Jersey, and undue influence.—

*Held*, that, though the instrument must be deemed to have been subscribed and published in substantial compliance with the requirements of the statutes of this State,—and though decedent's domicil must be deemed to have remained the city of New York, notwithstanding her removal to New Jersey, the domicil of her uncle, and his appointment as her guardian, and she, therefore, was of testamentary age,—the same was

executed principally by proponent's procurement, and was the result of undue influence exercised by her over decedent, and that, therefore, probate must be refused.

THIS was a petition for the probate of a will. The facts appear sufficiently in the opinion.

JOHN HARDY, *for proponent.*

REUBEN MAPELSDEN, JR., *for contestant.*

THE SURROGATE.—This is a contest over an instrument which purports to be the will of Fanny Bosch, and is offered for probate by her aunt, Mrs. Angelica Straub, whom it nominates as executrix. The probate is contested by decedent's sister, Pauline Seiter, who, as one of her next of kin, will be entitled to one half of her estate, if this instrument is denied probate. The pleadings and evidence present for consideration three questions.

### FIRST.

Has the due execution of the paper in controversy been satisfactorily proved?

The fact is undisputed, that it carries upon its face an apparent compliance with the statutory requirements, which establish the form of a testamentary paper and the mode of its execution. The signature of the decedent is in its appropriate place, and, at the end of a full attestation clause, appear the names of Mary A. Hemingway and Kate Leonard, the two attesting witnesses.

The latter, who was a servant of the proponent, died before the present controversy began. The other has given testimony which, though not without serious discrepancies and contradictions, tends to establish that the dece-

dent signed this disputed paper as her will, and that, in substantial compliance with the statute, she published it as such, and requested the attesting witnesses to act in that capacity.    Upon review of all the evidence bearing upon this branch of the case, I find, though not without hesitation, that contestant's objections in respect to the execution of this paper are not well taken.

## SECOND.

The second objection presents an interesting question, upon whose solution little light has been shed by reported judicial decisions.    That question grows out of the following state of facts: At the time the decedent executed the instrument under consideration, she was a minor, little above the age of sixteen years.    Neither her father nor her mother were then living.    The city of New York, which was the domicil of both her parents, admittedly continued, after their death, to be her own domicil and place of residence, until at least as late a date as December, 1878, when her uncle, Adam Straub, the husband of proponent, was appointed her guardian by a decree of my predecessor.

In the summer of 1877, while the decedent was living in this city, at the house of one Mrs. Kramer, she became so seriously, and, as it then seemed, so dangerously ill, that Mrs. Kramer telegraphed the proponent, who lived in Jersey City, New Jersey, to come to New York, for the purpose of taking her niece in charge.    Mrs. Straub at once complied with this request, and, on the succeeding day, accompanied by her husband, visited Mrs. Kramer's residence, and removed the decedent to St. Francis' Hos-

pital, in Jersey City, where she remained, save for brief absences, until the day of her death, in September, 1880. It was during this interval that her uncle, Adam Straub, applied for and received his letters of guardianship. On the 16th of October, 1879, Straub was removed from this trust by a judgment of the Supreme Court. Fifteen days later, the paper here offered for probate was signed and executed.

Upon these facts, the issue is raised whether the domicil of the decedent at all times continued to be in the city of New York, or whether, on the other hand, she had acquired, before executing the instrument which occasions this contest, the domicil of her guardian in the state of New Jersey. In the one case, being more than sixteen years old at the date of execution, her competency under the statutes of this State to make a will would not be open to question, on the score of age. But if, on the other hand, she was then domiciled in New Jersey, she could not, under the laws of that state, make any effectual testamentary disposition of her estate. It is strenuously urged by the contestant's counsel that this incompetency existed, and that the decedent, both at the time she executed the paper and at the time of her death, was a resident of Jersey City. It is true that she so describes herself in the disputed paper which commences: "I, Fannie Bosch of Jersey City, Hudson County, New Jersey." It is also true that she is alleged to be a resident of that city, in the proponent's original petition for probate, which, in this respect, was subsequently amended. The contestant claims that the decedent, when her uncle was appointed her guardian, herself became, because of his residence in New Jersey, a resident of that state.

This view is thought to be supported by the well known authority of Potinger v. Wightman (*3 Meriv., 67*, decided in 1817). In that case, Thomas Potinger, who was a native of England, had died intestate domiciled in the island of Guernsey, leaving him surviving his wife and several children. The widow was appointed guardian of these children by the Royal court of Guernsey, and subsequently removed with them to England. Two of them died there, and the question thereupon arose whether certain shares, to which they were entitled in the property of their deceased father, were distributable under the laws of England or under the laws of Guernsey. It was decided that the domicil of the children followed that of their mother and guardian, and that, therefore, the English and not the Guernsey law furnished the correct standard of distribution.

The contestant's counsel, in support of their position that a guardian has power to change the domicil of his ward, also cited Holyoke v. Haskins (*5 Pick., 20*), and Wood v. Wood (*5 Paige, 596*). In the former case, the question directly involved concerned the domicil, not of a minor but of a lunatic. In Wood v. Wood, by the will of a testator whose home had long been in Albany, N. Y., his brother was appointed both his executor and the guardian of his infant children, and was made trustee of the entire estate for the benefit of those children and of their mother, the widow of the testator. The trusts were peculiar, and were all framed with reference to a change of residence by the whole family from the State of New York to the state of Ohio. The widow was averse to this removal, and her objections were sustained by the Chancellor, in a proceeding brought, on behalf of

the infants, for preventing the testamentary guardian from removing them to Ohio. The Chancellor, in the course of an opinion wherein he asserted the power of the court to restrain the guardian as demanded by the complainants, said (and it is upon these words that the contestants rely in this proceeding): "I have no doubt as to the right of a parent or guardian to change the residence of his infant children or wards from one state to another, provided such change of residence is made in good faith and with a view to their benefit, subject, however, to the power of this court to restrain an improper removal of an infant by his guardian or even by his parent." This decision, as it seems to me, has no bearing upon the present controversy. The question, whether a guardian has power to compel his ward to *dwell* in a place of his selection, is by no means identical with the question, whether he has power to change such ward's *legal domicil*.

Upon careful consideration of this question, it seems to me very doubtful whether any guardian, other than a guardian by nature, has power to change the domicil of an infant ward.

"It is possible," says Dicey, in his valuable treatise on the "Law of Domicil," page 100, "that the domicil of an orphan follows that of his guardian, but whether this be so or not is an open question. In the first place, it may be doubted whether the rule is not, rather, that a ward's domicil *can be changed*, in some cases, by his guardian, than that *it follows* the domicil of his guardian. It is difficult to believe that the mere fact of D.'s guardian acquiring for himself a domicil in France can deprive D., the son of a domiciled Englishman, of his English domicil. In the second place, the power of a guardian to

change at all the domicil of his ward is doubtful.   In the one recorded English case on the subject (referring to Potinger v. Wightman, cited *supra*), the guardian was also the mother of the children.   As a matter of common sense, it can hardly be maintained that the home of a ward is, in fact, or ought to be as a matter of convenience, identified with the home of his guardian, in the same way in which the home of a child is naturally identified with that of his father.   Should the question ever arise, it will probably be held that a guardian cannot change the domicil of his ward, and almost certainly that he cannot do that, unless the ward's residence is, as a matter of fact, that of the guardian."

Westlake, in his "International Law" (2d ed., p. 272), states the rule on this subject as follows: "The law or jurisdiction of the father's last domicil provides for the guardianship, after his death, of his legitimate or legitimated unmarried minor children.   The guardian, whether appointed by the father under that law, or by that law of jurisdiction itself, cannot change his ward's domicil except so far as he may be permitted to do so by the terms of his appointment, or by the law or the public authority under which he holds his office."

Assuming, however, that Mr. Straub, in the case at bar, had power to change the domicil of this decedent if he had chosen to do so, I am, nevertheless, clearly of opinion that no such change was actually effected.   It does not appear that, at the time she was removed to the hospital in Jersey City, there was any definite plan or purpose, in her own mind, or in that of her uncle or aunt, as to her future residence.

Indeed, the doctrine is too well settled to require the

citation of authorities in its support, that her own intentions are of no possible consequence in the solution of the problem under discussion. It does not appear that, at any time between her arrival at the hospital and the date of her death, any intention to change her residence from New York to Jersey City was formed by her uncle or aunt, or that either of them did any act which evinced or even suggested the existence of any such purpose. Now it is clear, from the authorities above cited, that the bare fact of the grant of letters of guardianship did not, *ipso facto,* effect a change in decedent's domicil.

I, therefore, hold that, when the decedent executed this disputed instrument and when she died, her domicil and residence were in the city of New York, and that, being above the age of sixteen years, she was competent to make a will for the disposal of her personal estate.

## THIRD.

There remains for consideration the most important issue in the case. The contestant claims that the paper propounded does not express the free and untrammeled wishes of Fanny Bosch, but that, in the preparation and execution of that paper she was a mere passive instrument in the hands of others. There have been many attempts to describe with exactness that kind of influence, whose exercise is deemed in law an adequate cause for denying probate to a will. In the nature of things, such attempts have always been failures. Each case must be determined according to its own peculiar facts and circumstances, having in view the simple principle, that no instrument can be established as a will unless it speaks

the true and voluntary purpose of its maker.  He may, of course, be governed in its dispositions by considerations of affection and regard, and run no risk thereby of imperilling its validity.  Even the earnest persuasions of the interested and self-seeking will not necessarily vitiate a testamentary instrument by which they are largely benefited, provided it appears that the testator, in selecting them as the recipients of his bounty, has acted upon his own judgment and has not merely given expression to the purposes of others, by whose will his own has been subdued.

As has been stated already, this decedent, when she executed the paper propounded as her will, was a girl barely sixteen years of age.  It appears, by the testimony of several witnesses, that she was weak in body, of gentle and compliant disposition, and with little strength of character.  Mr. Hendrickson, who was her guardian *ad litem* in certain proceedings, describes her as a person "with no force about her."  Her power of will was doubtless weakened by her long and serious illness.  One of the attesting witnesses, Mrs. Hemingway, who is manifestly friendly to the interests of the proponent, constantly refers to decedent as "the little girl"—a phrase which has, as it seems to me, a marked significance.  It is evident that, by reason of her youth, her illness and her docility, her will could easily have been dominated by any person who had the motive and opportunity to control it.

By the law of England (1 Vict. Stat., chap. 26), no persons under twenty-one years of age, except soldiers and sailors in actual service, are competent to make a testamentary disposition of their estates.  Provisions sim-

ilarly restrictive appear upon the statute books of many states in our own country. In twenty-six of them, no person under full age can devise or bequeath property by will, and in eight others no bequest or devise is valid unless made by a person who has reached the age of eighteen years.

These facts emphatically attest the existence of a wide-spread belief that the extension, to persons of immature years, of the right to dispose of property by will is a policy which is unwise and is likely to be mischievous in its consequences. The statutes of our own State permit a female infant of sixteen years or upwards to make a will of personal property, but, despite this fact, the rule of exclusion which almost universally prevails elsewhere is here a legitimate and a very important subject of consideration. It gives emphasis to the proposition, which must be conceded to be sound, that the degree of control which is sufficient to invalidate a will depends largely upon the age of the will maker, and that influences, which might legitimately be exercised upon a person of mature years, justly fall under the condemnation of the law when they are brought to bear upon a girl of sixteen.

Upon examining the only dispositive provision of this instrument, it is found to be as follows : ''I give and bequeath to my beloved aunt, Angelica Straub . . . . all the money or moneys due me or to become payable to me at or after the time of my decease, and all and everything else I may possess or have any interest in at such time, to have and to hold to her and to her legal representatives forever." Then follows, "I hereby appoint my said aunt, Angelica Straub, my sole and exclusive executrix of this my last will and testament." This in-

strument, from which the proponent alone can derive any benefit, came into existence, as I am fully persuaded upon the evidence, principally by her procurement. Her own version of the circumstances attending its execution, as well as of other material facts in the case, is confused, self-contradictory, and in some respects palpably false.

It appears that the decedent was brought to her aunt's house for the purpose of executing this paper, and that she was immediately afterwards taken back to the hospital. This alone is a suspicious circumstance, and the inferences which it suggests are greatly strengthened by other parts of the evidence. Mrs. Straub, her son and her two daughters were all present at the time of the execution of the paper. The son is now over twenty-one years old, and the younger of the daughters is above the age of seventeen. Though they all seem to have been accessible at the time of the trial, none of them was produced as a witness.

The so called will was drawn by a lawyer who, for some unexplained reason, retired from the premises just before its execution and returned just after. Prominent among the many statements of the proponent which were satisfactorily disproved was her denial, upon cross-examination, that, at the time of the will-making at her residence, she knew that the decedent had a claim to certain insurance moneys. Letters were introduced, whereby her knowledge upon that subject was conclusively established. It appeared, by the testimony of Mr. Schuster, that, on a certain occasion, he asked Mrs. Straub by whom the will of Fanny Bosch had been witnessed. She said that it had been witnessed by her servant girl and by

Mrs. Hemingway, who was "as stupid as horse manure." Schuster, thereupon, intimated that he doubted the sufficiency of this attestation, to which Mrs. Straub replied that the witnesses were good enough and "would do all she had to say about it."

Counsel for the contestant cite many authorities in support of the doctrine that a will made by a ward in favor of his guardian should be subjected to close scrutiny, and that it is especially open to suspicion when the guardian has taken an active part in its execution. These decisions seem to me to have apt application to the case at bar. Though the paper in dispute gives the property to Straub's wife and not to Straub, and though his letters of guardianship happened to be canceled about two weeks before the execution of this paper, the force of the doctrine established by the cases cited is thereby weakened slightly, if it all.

No testimony was introduced on the part of the proponent which has served to allay the suspicions aroused by the evidence to which I have called attention. I feel compelled to deny this petition for probate.

A decree may be entered, accordingly.